IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| STACY WITHROW, | ) | CASE NO. 5:17CV1407 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE DONALD C. NUGENT |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Stacy Withrow ("Withrow") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying her applications for

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the

undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule

72.2(b)(1).

For the reasons stated below, the undersigned recommends that the Commissioner's

decision be **AFFIRMED**.

## I. Procedural History

In April 2014, Withrow filed applications for DIB and SSI, alleging a disability onset

date of September 4, 2013.  Tr. 204-209.  She alleged disability based on the following: bipolar,

migraines, lower lumbar stenosis, high cholesterol, high blood pressure, OCD, and depression.

Tr. 212.  After denials by the state agency initially (Tr. 98, 99) and on reconsideration (Tr. 115,

116), Withrow requested an administrative hearing.  Tr. 151.  A hearing was held before

Administrative Law Judge ("ALJ") Jeffrey Raeber on April 6, 2016.  Tr. 29-57.  In his April 25,

2016, decision (Tr. 10-21), the ALJ determined that there are jobs that exist in significant

numbers in the national economy that Withrow can perform, i.e. she is not disabled.  Tr. 20.

Withrow requested review of the ALJ's decision by the Appeals Council (Tr. 196) and, on May

17, 2017, the Appeals Council denied review, making the ALJ's decision the final decision of the

Commissioner.  Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Withrow was born in 1973 and was 33 years old when she filed her applications.  Tr. 204.

She has a bachelor's degree in finance and previously worked for sixteen years as a financial

analyst for a hospital.  Tr. 33-34, 36.

### B. Relevant Medical Evidence

**Physical:** On April 23, 2013, Withrow saw neurologist Jose M. Casanova, M.D., for

treatment for her migraines.  Tr. 474.  She was working at that time.  Tr. 474.  Her headaches had

been getting worse over the past two months—she was having them every day—and she felt that

her medication was not working well.  Tr. 474.  Upon exam, Withrow was alert, oriented, had

normal recent and remote memory, normal attention span and concentration, and normal

comprehension.  Tr. 474.  She had normal muscle strength and tone, reflexes, sensation and

coordination, and she stood and walked with a normal gait and station.  Tr. 476.  Dr. Casanova

discontinued her present medication and prescribed a new medication, Topamax.  Tr. 476.  Her

diagnoses remained chronic migraine without aura, bipolar disorder, and anxiety.  Tr. 476.

On June 18, 2013, Withrow returned to Dr. Casanova and reported that her headaches

had improved with Topamax and that she was "doing relatively well."  Tr. 463.  Her psychiatrist

had also changed her medications, which made her feel better.  Tr. 463.  She complained of right

low back pain and reported that she had gone to the emergency room and they had discovered a small kidney stone.  Tr. 463.  Her exam findings were normal other than she had some pain in her right thigh and positive straight leg raise on the right.  Tr. 463-464.  Dr. Casanova continued her medications and ordered a lumbar MRI.  Tr. 465.

The MRI was taken on June 25, 2013, and showed generalized disc bulge and bilateral facet arthropathy without significant spinal canal stenosis and moderate right and mild left foraminal stenosis at L4-5; and, at L5-S1, a central disc protrusion and bilateral facet arthropathy without significant spinal canal stenosis, disc material contacting the left S1 nerve root without mass effect, and mild left foraminal stenosis.  Tr. 319.  The impression was "mild degenerative changes in lower lumbar spine."  Tr. 319.

On August 14, 2013, Withrow saw pain management specialist A.N. Takla, M.D., complaining of low back pain radiating down into her right leg.  Tr. 340-343.  She reported difficulty walking and balancing, weakness in her left arm and right leg, and sensory disturbances in her right leg.  Tr. 341.  Upon exam, she had normal muscle strength in all four extremities, no evidence of light touch perception deficits, normal reflexes, some tenderness in her lumbar paraspinal muscle area with motion and palpation, normal deep tendon reflexes in both lower extremities, and negative straight leg raise testing bilaterally.  Tr. 341.  Dr. Takla recommended a L4-L5 facet medial nerve branch block, which Dr. Takla administered on August 29.  Tr. 338.

On September 20, 2013, Withrow followed up with Dr. Casanova regarding her migraines.  Tr. 456.  She stated that she was not doing well, explaining that her migraines had increased during the past month and a half and that she had been laid off from her job.  Tr. 456.  She had daily headaches and significant distress.  Tr. 456.  Upon exam, she appeared to be in no

acute distress, was alert and oriented, had normal speech, concentration, memory, and fund of knowledge, and normal strength, tone, reflexes, sensation, coordination, gait, and station.  Tr. 457-458.  Dr. Casanova increased her Topamax dose and recommended occipital nerve block injections and trigger point injections in her cervical spine.  Tr. 458.

On October 22, 2013, Withrow saw Robert Gsellman, M.D., for a routine examination. Tr. 360.  She was taking her medications regularly and reported no side effects.  Tr. 360.  Her active problem list included benign hypertension, high cholesterol, malaise and fatigue, allergic rhinitis, and sleep disturbance.  Tr. 360-361.

On December 17, 2013, Withrow followed up with Dr. Casanova regarding her migraines and low back pain.  Tr. 453.  She complained that she had not been doing well and that her headaches were out of control.  Tr. 453.  She lost her insurance two months prior, had run out of medication 4 weeks prior, and, since she ran out of medication, her headaches had increased "200%."  Tr. 453.  She got new insurance two weeks prior and she asked Dr. Casanova for prescription renewals.  Tr. 453.  She also complained of increased lumbar pain radiating into her right leg.  Tr. 453.  Upon exam, she appeared to be in no distress and her physical findings were normal.  Tr. 454-455.  Dr. Casanova refilled Withrow's prescriptions and referred her to pain management for another lumbar injection.  Tr. 455.

On March 6, 2014, Withrow went to the emergency room primarily due to low back pain, more on the left than the right; she also complained of a migraine.  Tr. 643.  Upon exam, she had full strength and normal sensation.  Tr. 643.  After medication treatment, she was improved and discharged diagnosed with back pain, migraine, and a urinary tract infection.  Tr. 644.

On May 20, 2014, Withrow went to the emergency room complaining of sharp pain in the left side of her lower back.  Tr. 640.  She was diagnosed with a kidney stone and acute

kidney infection and was discharged with a referral to a urologist.  Tr. 642.  On May 27 she had surgery to remove her kidney stone.  Tr. 653.

Having regained her insurance, Withrow resumed her lumbar injections.  Tr. 667.  Dr. Takla administered the first two epidural steroid injections of a series at L5-S1 on June 5 and July 3, 2014.  Tr. 667-668, 665-666.

On July 15, 2014, Withrow followed up with Dr. Casanova for her migraines and stated that she was doing well.  Tr. 705.  She reported that her lumbar pain improved after her recent injection.  Tr. 705.  Dr. Casanova remarked that her headaches remained well controlled.  Tr. 705.  Withrow denied any medication side effects.  Tr. 705.  Her physical and neurological exam findings were normal and Dr. Casanova rated her migraines, low back pain, and bipolar disorder as "stable" and continued her medications at the same doses.  Tr. 706.  He also listed chronic cervical pain as a diagnosis.  Tr. 706.

On September 5, 2014, Withrow saw Dr. Casanova for a follow-up for her migraines and low back pain.  Tr. 708.  Withrow reported that she was "doing relatively well" and Dr. Casanova remarked that her headaches appeared to be controlled; she had approximately two headaches a week and they responded to her medication.  Tr. 708.  Her low back pain was also improved.  Tr. 708.  She denied medication side effects.  Tr. 708.  Her exam findings were normal.  Tr. 708-709.  Dr. Casanova rated her migraines as "stable," her low back pain as "improvement with epidural blocks," her bipolar disorder as "stable," and her cervical pain as "improved."  Tr. 709.  He maintained Withrow's medications and stated that she was to continue her lumbar injections and that he would refer her to physical therapy.  Tr. 709.

On November 3, 2014, Withrow returned to Dr. Takla for her third lumbar epidural injection, reporting that she had about two months relief from the prior injection.  Tr. 733.

On November 12, 2014, Withrow saw Dr. Casanova for a follow-up visit.  Tr. 779.  Dr. Casanova remarked that Withrow's headaches appeared to be stable; she had one to two headaches weekly and they usually responded to treatment.  Tr. 779.  She denied any medication side effects.  Tr. 779.  Dr. Casanova wrote, "She feels that her lumbar pain is getting progressively worse, but the MRI findings are negative."  Tr. 779.  Her exam findings were normal.  Tr. 779-780.  Dr. Casanova listed her diagnoses as chronic migraine without aura, bipolar disorder, and herniated lumbar disc and continued her medications.  Tr. 780.

On February 13, 2015, Withrow saw Dr. Casanova for a follow-up visit.  Tr. 776.  She again reported that her headaches appeared to be relatively well-controlled, she had one to two a week, and they usually responded to medication.  Tr. 776.  Her mood was also well-controlled and she denied mood swings.  Tr. 776.  She complained of increased low back pain radiating into her left leg.  Tr. 776.  Her physical exam findings were normal.  Tr. 776-777.  Dr. Casanova continued her medications and referred her for two to three epidural injections for her back pain. Tr. 777.

On April 20, 2015, Dr. Takla gave Withrow the first in a series of epidural steroid injections at L5-S1.  Tr. 807.

On May 15, 2015, Withrow saw Andrew Stalker, M.D., at Dr. Casanova's office.  Tr. 887, 892.  She reported three to four migraines in the last month and medication helping to relieve them.  Tr. 887.  Her recent lumbar epidural steroid injection helped some and she had her next one scheduled in about two weeks.  Tr. 887.  She denied medication side effects.  Tr. 887.  Her exam findings were normal.  Tr. 889-890.  Dr. Stalker continued Withrow's medications. Tr. 890.  On May 29, Dr. Takla administered another lumbar epidural steroid injection.  Tr. 870-871.

On August 14, 2015, Withrow saw Dr. Casanova for a follow-up. Tr. 881. She stated that she had gone to Florida for vacation, had a slight increase in headaches while there, and, upon her return home 2-3 weeks ago, she has had daily headaches and her medication was not working. Tr. 881. Dr. Casanova remarked that Withrow's report that she had not been taking her sleeping medication and had not been sleeping well may have also triggered her cycle of current headaches. Tr. 881. Her back pain was starting to increase; her lumbar epidural injections had been working well to relieve her back pain but her insurance refused any more injections for six months. Tr. 881. Her bi-polar was very well controlled. Tr. 881. Her examination findings remained unchanged and normal. Tr. 883-884. Dr. Casanova prescribed a Medrol pack for her back pain and 3-day IV infusion for her headache, noting that it had been over one year since her last headache cycle. Tr. 884.

On November 17, 2015, Withrow told Dr. Casanova that her headaches had increased in frequency recently due to stress. Tr. 896. Her back pain had increased and she reported that her lumbar injections had provided very good relief of back pain lasting for seven to eight months. Tr. 896. Her mood appeared to be well controlled and she denied any significant depression. Tr. 896. Her exam findings remained unchanged. Tr. 897. Dr. Casanova administered an occipital nerve block to treat Withrow's headaches, observing that her symptoms had improved in the past with this treatment, and he referred her for another lumbar epidural injection. Tr. 897-898.

On December 23, 2015, Withrow received a lumbar epidural steroid injection. Tr. 895.

On December 28, Withrow saw Dr. Casanova for an occipital nerve block. Tr. 894. She stated that she was doing well and denied any medication side effects. Tr. 894.

**Mental:** In April 2013, Withrow began counseling with psychiatrist Gina D. Glenn, M.D., at Summa Psychiatric Associates. Tr. 690-692, 689. She reported depression, anxiety,

and obsessive compulsive disorder ("OCD").  Tr. 690.  Upon exam, she had a cooperative demeanor; good eye contact; normal, coherent speech; a full, appropriate affect; fair judgment and insight; good attention and concentration; and intact recent and remote memory.   Tr. 691-692.  Dr. Glenn observed no depression, anxiety, anger, or anhedonia.  Tr. 691.  She assessed a global assessment of functioning (GAF) score of 64.[1]  Tr. 692.  She adjusted Withrow's medications and assessed her with mood disorder, NOS; generalized anxiety disorder; and rule out bipolar disorder.  Tr. 692.

In July 2013, Withrow was hospitalized for three days as a psychiatric admission after an intentional drug overdose.  Tr. 327, 647.  She reported "many" life stressors including a custody battle with her estranged husband, having been suspended from work for 5 days, and depression.  Tr. 327.  She stated that she had just wanted to sleep for a long time.  Tr. 327.  The psychiatric evaluation completed at the time of admission diagnosed Withrow with mood disorder NOS, rule out bipolar 2 disorder, and rule out OCD.  Tr. 332.  She was assigned a GAF score of 21 to 30.[2] Tr. 333.

On September 11, 2013, Withrow saw Dr. Glenn.  Tr. 700.  She stated that she had recently been fired from her job due to being late and that she was planning to apply for unemployment benefits and look for a new job.  Tr. 700.  She had been walking more lately and had lost 4 to 5 pounds.  Tr. 700.  Upon exam, she was cooperative, made good eye contact, and

---

[1]  GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision, Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 61 and 70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  *Id.*

[2]  A GAF score between 21 and 30 indicates "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g. stays in bed all day; no job, home, or friends)." DSM-IV-TR, at 34.

had normal speech, good concentration, and intact recent and remote memory.  Tr. 701.  Her depression was mild and improved and her anxiety was mild.  Tr. 701.  Dr. Glenn assessed a GAF score of 64 and adjusted her medications.  Tr. 701-702.

On April 30, 2014, Withrow visited Portage Path Behavioral Health, stating that she had lost her health insurance in February and had not been able to get her medications; as a result, her symptoms had worsened.  Tr. 762.  She alleged depression, bereavement issues, anxiety, panic attacks, post-traumatic stress symptoms, anger, mania, fatigue, sleep disturbance, and compulsive behaviors.  Tr. 765-767.  A psychiatric evaluation was completed on May 5, 2014. Tr. 758.  She was diagnosed with bipolar I disorder, panic disorder, PTSD, and OCD.  Tr. 760-761.  She was started on medication and was to follow up for further treatment.  Tr. 760.  She was assigned a GAF score of 54.[3]  Tr. 761.

On July 9, 2014, Withrow saw Kristen Drollinger, LPCC (Licensed Professional Clinical Counselor), at Portage Path for counseling.  Tr. 750.  She described familial stressors, including child custody issues with her ex-husband, and stated that the last couple years had been "real bad, but I'm finally starting to come back from it all."  Tr. 750.  She felt like her medications were working again and she was trying to get back on her feet.  Tr. 750.  Upon exam, Withrow was adequately groomed, had an appropriate affect, was cooperative, had pressured speech, and an anxious and euthymic mood.  Tr. 750.

On August 6, 2014, Withrow told Drollinger that things had been "real stressful" lately as she and her boyfriend, a veteran, were trying to find new housing and had been going back and forth between Withrow's mother's house and her boyfriend's house.  Tr. 748.  She had been trying to read more to keep her mind focused.  Tr. 748.  Upon exam, she had a labile affect,

---

[3]  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  DSM-IV-TR, at 34

depressed mood, and cooperative behavior.  Tr. 748.  Drollinger advised Withrow that there were support groups for women in relationship with veterans, given her boyfriend's PTSD, which Withrow appeared excited to hear about.  Tr. 748.

On August 27, 2014, Withrow described continued stress in her domestic life, including conflict between her boyfriend and his family members resulting in police intervention and a court date, and explained that she had to take her boyfriend to various appointments.  Tr. 744. Upon exam, she was appropriate, cooperative and depressed.  Tr. 744.  Drollinger scheduled an evaluation for Withrow to participate in a group therapy program and discussed healthy self-care strategies.  Tr. 744.

On September 9, 2014, Withrow saw nurse practitioner James Tudhope at Portage Path for medication management and an evaluation.  Tr. 741-742.  She reported less obsessive and anxious thoughts since her last medication change, but she still indicated she had ongoing restlessness and anxiety.  Tr. 741.  She stated that her neurologist told her not to participate in the group therapy program because she is unable to sit for three hours.  Tr. 837.  Tudhope encouraged her to follow up with her therapist about this to see if she could stand every 20-30 minutes to stretch her back during the sessions.  Tr. 837.  He increased her medication dose.  Tr. 741.

On October 15, 2014, Withrow told Drollinger that things had been going better lately. Tr. 736.  She had been sleeping better and did not feel so antsy.  Tr. 737.  She was spending more time with her son and she and her boyfriend, now her fiancé, found housing and were moving in a month's time.  Tr. 736.  She had not been able to attend coping skills therapy because she had had the flu and she had been driving her fiancé around to his appointments.  Tr. 736.  She was hopeful to begin attending them because her fiancé would no longer be getting

10

weekly injections, requiring her to drive him "all the way out there every single week." Tr. 736. Upon exam, she was cooperative with an appropriate affect and a euthymic mood. Tr. 736.

On January 7, 2015, Withrow returned to Drollinger and reported that things were going a lot better, she and her fiancé had moved into a new home, and she continued to spend time with her son. Tr. 826. She was feeling exhausted and somewhat down but was "more happy than I was before." Tr. 826. She explained that she was still getting adjusted to being with her fiancé and that it was hard because he had PTSD and schizophrenia and was still getting injections every other week and having a counselor coming out daily, which was helpful but overwhelming. Tr. 826. Upon exam, she was appropriate, cooperative, avoidant at first, and depressed. Tr. 826-827. Drollinger helped Withrow recognize and process her thoughts and feelings stemming from being the "primary caretaker for someone with severe and persistent mental illness." Tr. 827.

On February 4, 2015, Withrow told Drollinger that she was frustrated and overwhelmed caring for her fiancé, whose delusions and hallucinations had gotten worse these last six months. Tr. 824. On March 4, she reported things had been going "really good" lately after her fiancé's medications had been adjusted and his symptoms had improved. Tr. 822. On March 12, Withrow saw Tudhope and reported sleeping better, an improved mood, and that her medications had been helpful and well-tolerated. Tr. 819. Upon exam, she had cooperative behavior, a full affect and a euthymic mood. Tr. 819.

On April 29, 2015, Withrow saw Drollinger and explained that she missed her previous appointment because she had to stop her fiancé from violating his probation. Tr. 816. Aside from this incident, things had been going "really great," she had been spending more time with her son, and she had "even recently planned a trip for the three of them to visit her parents in

11

Florida." Tr. 816.  She was appropriate and cooperative, had a euthymic mood, good insight, good judgment, and logical thoughts.  Tr. 816.  She told Drollinger that "things really are going so much better, I think the medications really help," and also because her fiancé had not had any delusions lately.  Tr. 817.

On June 3, 2015, Withrow told Drollinger that things continued to go well.  Tr. 954.  On June 18, she informed Tudhope that medication helped her focus and decreased her anxious thoughts.  Tr. 951.  She asked about an increase in her medication, which Tudhope allowed.  Tr. 951.  Upon exam, she had a full affect, cooperative behavior, and an anxious mood.  Tr. 951.

On July 22, 2015, Withrow saw Drollinger and stated that she had recently returned home from a three week vacation in Florida, which had gone "really well."  Tr. 949.  She described that her cousin "just kept taking us shopping" and had bought them a number of things.  Tr. 949.  She had no change in symptoms or functioning since her last visit.  Tr. 949.  Drollinger discussed with her how her symptoms had improved over the past year, and Withrow stated that her anxiety and depression issues "are definitely better."  Tr. 949.  On September 17, Withrow told Drollinger that she had been doing "pretty good" and that she and her fiancé had recently purchased a larger mobile home and were going to be moving in the next day.  Tr. 933.  Upon exam, she was appropriate and cooperative and had a eurythmic and anxious mood.  Tr. 933.  Withrow stated that, since last year, she was "doing a lot better."  Tr. 934.

On December 16, 2015, Withrow told Drollinger that she had been doing "ok" lately and explained that she had recently received additional visitation rights after a family court hearing but that if she wanted parental rights she would have to fight her ex-husband in mediation.  Tr. 922.  On January 27, 2016, Withrow reported that she continued to be "pretty good" and she had helped her parents move into a new house.  Tr. 920.  She indicated that, aside from frustration

with some of her family members' behavior, she had no significant changes in symptoms or functioning since her last visit.  Tr. 920.

On March 3, 2016, less than two months before the administrative hearing, Withrow reported to Drollinger that she was doing "pretty good" and had been going over to check on her parents' house while they were in Florida for the winter.  Tr. 918.  Upon exam, she was appropriate, cooperative, and depressed.  Tr. 919.  Drollinger opined that Withrow continued to demonstrate improvement in her ability to implement learned coping skills.  Tr. 919.

### C. Function Report

In July 2014, at the time she filed her application, Withrow completed a Function Report. Tr. 260-267.  She stated that her migraines, lumbar stenosis, bipolar, depression, and OCD limited her ability to work "due to medication [and] emotional stability."  Tr. 260.  Her medications made her sleepy and she would lie in bed most of the day.  Tr. 261.  She would also wake up numerous times during the night.  Tr. 261.  Her medication also made her forgetful.  Tr. 262.  She made easy dinners every day, it would take her 1-2 hours, and she would have to sit to prepare the food.  Tr. 262.  She did not do house work or yard work because it was too hard on her back and the chemicals caused headaches.  Tr. 263.  Her bipolar caused mood swings and irritability and her depression caused a lack of concentration.  Tr. 265.

### D. Opinion Evidence

#### 1. Treating source

On March 7, 2016, Drollinger completed a mental health questionnaire on behalf of Withrow.  Tr. 962-964.  Drollinger opined that Withrow would have noticeable difficulty (i.e., over 20% of the time) understanding, remembering, and carrying out detailed instructions; she would miss about three days of work per month; would need additional breaks due to her

occasional poor stress tolerance; and would be off task 15-20% percent of a workday.  Tr. 962-963.  Drollinger explained that Withrow was the primary caretaker for her fiancé and that this caused near daily additional stress and impaired her overall functioning.  Tr. 964.

### 2. Physical therapy evaluation

On August 7, 2014, Withrow presented for a 3-hour evaluation with physical therapist Dean Sarris on referral from her attorney.  Tr. 676.  Sarris stated that Withrow can perform light to sedentary work and had a "floor to knuckle lifting ability of 20 pounds."  Tr. 676.  Testing showed that Withrow had a range of motion in all four of her extremities that were within functional limits and her trunk had a 50% range of motion and her cervical spine 75% range of motion.  Tr. 678.  She had decreased grip strength and Sarris commented, "Stacy did not demonstrate maximum effort with grip testing."  Tr. 679.  She demonstrated some weakness in her lower extremities and trunk.  Tr. 679-680.

Sarris completed a questionnaire in which he indicated that Withrow could lift up to 20 pounds occasionally and carry up to 10 pounds frequently; could stand or walk for less than 3 hours during an 8-hour workday for no more than 5 minutes at a time; sit for less than 3 hours during an 8-hour workday for no more than 15 minutes at a time; never climb, crouch, or crawl; and occasionally balance, stoop, and kneel.  Tr. 674.  She would miss more than 4 days of work a month from pain or fatigue, would be off-task over 20% of a typical workday, and would need to lie down 2 hours or more during a typical workday.  Tr. 675.  She would need an unscheduled break about 4 times per day in additional to regular work breaks even when performing sedentary work.  Tr. 675.  Sarris explained that he used pain questionnaires to determine how pain was affecting Withrow's functional ability, and explained that high scores on these questionnaires is "frequently associated with clients who are amplifying their pain."  Tr. 676.

14

Sarris observed that Withrow scored high in 15 out of 24 categories and "equivalent to high" in 6 out of 24 categories.  Tr. 676.  He also stated that Withrow's objective test "was considered an inconsistent measure of the maximum functional ability of this client."  Tr. 676.

### 3. State Agency Reviewers

Physical: On August 26, 2014, state agency reviewing physician Gerald Klyop, M.D., reviewed Withrow's file.  Tr. 75-77.  Regarding her RFC, Dr. Klyop opined that Withrow could lift and carry up to 20 pounds occasionally and 10 pounds frequently, stand and/or walk up to about 6 hours, sit for up to about 6 hours, and occasionally climb.  Tr. 76-77.  On November 7, 2014, Leon D. Hughes, M.D., reviewed Withrow's file and adopted Dr. Klyop's opinion.  Tr. 109-110.

Mental: On August 29, 2014, state agency reviewing psychologist Katherine Fernandez, Psy.D., reviewed Withrow's file.  Tr. 74-75, 77-78.  Regarding her RFC, Dr. Fernandez opined that Withrow could understand, remember, and carry out moderately detailed 3-4 step tasks that do not require a fast pace.  Tr. 78-79.  On December 3, 2014, state agency reviewing psychologist Joseph Edwards, Ph.D., reviewed Withrow's file and opined that, in addition to Dr. Fernandez's findings, Withrow would need to work in a setting where major changes are explained ahead of time and are graduated.  Tr. 107-108, 110-112.

### E.  Testimonial Evidence

#### 1. Withrow's Testimony

Withrow was represented by counsel and testified at the administrative hearing.  Tr. 31-52.  She testified that she lives with her fiancé in a trailer and had been doing so for the past two years.  Tr. 37, 51.  They met online.  Tr. 42.  She has a 12 year-old son who lives with his father and whom she sees every other weekend and on holidays.  Tr. 37.

Withrow detailed the duties of her prior job as a financial analyst for a hospital.  Tr. 33-34.  She sat about 75% of the time and 25% of the time she would be walking to go to a meeting or elsewhere.  Tr. 33-34.  She would calculate the differences for each hospital division and figure out whether they were over or under budget.  Tr. 36.  She was terminated when she was late for work one day; she also had been falling asleep at her desk due to medication changes.  Tr. 34.  Her back started bothering her, it got hard to sit, and she just started getting into trouble more and more at work.  Tr. 34.  She recently tried to do some volunteer work at a food bank with her fiancé for two hours; she sat in a chair and tried to help pass out food but it didn't work out well so she just sat in the car most of the time and waited until her fiancé was done.  Tr. 34.

Withrow drove herself to the hearing.  Tr. 34.  During the day she does not do much of anything.  Tr. 34.  She and her fiancé just lie on the couch and watch television.  Tr. 37.  Her medications make her really sleepy so she does not do a whole lot.  Tr. 37.  This has been going on for "quite a while."  Tr. 37.  She does not drive her fiancé around during the day, but if he has a doctor's appointment "we usually go to the doctor's appointment."  Tr. 38.  She does not do many household chores other than tidying up; for instance, she will fold blankets and put them on the couch, pick up things here and there, and put the laundry in the washer.  Tr. 38.  Her fiancé takes the laundry out and folds it and does other chores.  Tr. 38.  They both cook.  Tr. 51.  Her fiancé is a veteran and has paranoid schizophrenia.  Tr. 38.  The last time he had a problem due to his disorder was in 2013.  Tr. 38.  She takes him to his doctor appointments to get a shot "but his is managed—he goes to his regular appointments, and he manages it pretty well.  He doesn't have any issues."  Tr. 38.  Once in a great while they will go to a movie together.  Tr. 39.

Withrow discussed her trip to Florida.  Tr. 39.  She explained that her mother paid for her to fly with her son and fiancé to her grandmother's house in Florida for two weeks.  Tr. 39-40.

16

While there, she took her son to a gaming conference. Tr. 39. She had also been to Georgia in 2013 when her aunt passed away. Tr. 40. She drove down with her mom and dad and her dad did all the driving. Tr. 40. Withrow stated that she likes to read and that she reads romance novels. Tr. 40. She used to use a computer but does not anymore. Tr. 40.

When asked what prevents her from working, Withrow stated that, when she sits too long, her back feels like she's having a baby. Tr. 41. She gets migraines that are so intense that she has to lie in bed for hours to get them to go away and she also has a problem focusing. Tr. 41. At work, she used to do what her counselor advised; she would pull up a spreadsheet when she had scattered thoughts and type out her thoughts. Tr. 41. This way, she could pretend like she was working and she could get her scattered thoughts written out. Tr. 41. Her mind wanders and her medication makes her extremely tired. Tr. 41. She takes pain medication every 4-6 hours. Tr. 41. That's why she does not drive often, because she takes pain medication. Tr. 41. She also has epidural injections in her back and head. Tr. 41. The last time she had a migraine was a week prior to the hearing, and she had to take a Sumatriptan shot, which makes her tired for about two to three hours and forces her to lie down. Tr. 42, 46. She takes one of these shots once or twice a week when she gets a migraine. Tr. 42, 46.

Withrow testified that the most she can lift is a bag of eggs at the grocery store. Tr. 43. She explains, "we go and we get enough for a day of food and that's it." Tr. 43. She does not have problems using her hands. Tr. 43. It is sometimes hard to lift her arms up for too long. Tr. 43. She has a hard time standing too long and could stand for about maybe 10 minutes before having to sit down. Tr. 43. That has been the case since her back started bothering her in 2012. Tr. 43. She can only sit for a little bit at a time, about 20 minutes. Tr. 43. This has been the case for about three years. Tr. 43. She did not have any other conditions. Tr. 44. When asked

about her depression and anxiety, Withrow explained that she has always had problems with depression and anxiety.  Tr. 44.  Her depression comes and goes.  Tr. 44.  It got worse after she was pregnant and as she has gotten older it seems to have become more manic.  Tr. 44.  When asked what problems she had with mania, she stated that she had some manic issues in the past but that she hasn't had any lately.  Tr. 44.  She has been doing really well with that.  Tr. 44.  It has been calmed down a lot and her anxiety has been calmed down by Vistaril and she is doing "really good with that."  Tr. 44.  With counseling and medication, her depression has gotten "a little bit better."  Tr. 51.

Withrow takes her medications as prescribed.  Tr. 45.  She has side effects from them; she gets tired and her Topamax for her migraines makes her "get a little like I can't think of what I'm going to say."  Tr. 45.  She also has problems sleeping and takes Ambien.  Tr. 47.  She sleeps for about two to three hours at a time.  Tr. 47.  She usually sleeps form about 10 p.m. to 1 a.m., from 4 a.m. to about 10 a.m., and then she sleeps again until 12.  Tr. 52.  The longest she is awake at one time is about 4 hours.  Tr. 52.  Her Risperdal was recently increased to try to slow down her racing thoughts that keep her awake.  Tr. 47.  When asked if she ever had visual or auditory hallucinations, Withrow stated that she has had auditory hallucinations, especially at night, and that she last had them about six months prior to the hearing.  Tr. 47.  She told her medication psychiatrist at Portage Path about it.  Tr. 47.  She goes to Portage Path every month. Tr. 48.  She also sees Dr. Casanova, her neurologist, every three months, and she goes to pain management to have her lumbar injections once every four months.  Tr. 48.  After she gets a lumbar injection she can't drive for six hours.  Tr. 48.  She gets head injections from Dr. Casanova every three months.  Tr. 49.  Her head injections have helped with the aura of her

migraines; it does not prevent her from getting the migraines.  Tr. 49.  It helps her neck from being tense.  Tr. 49.

When asked if she could work today, Withrow responded that she could not because she does not have the focus.  Tr. 49.  She can watch a television show for one hour and remember what happens but not a two-hour movie.  Tr. 49.  She falls asleep when she watches television and her back is always hurting.  Tr. 49.  It doesn't hurt when she lies on her couch.  Tr. 49.  If her back is not hurting she can get up and stand.  Tr. 50.  If she gets a migraine she lies down in her bedroom.  Tr. 50.  She cannot do these things when she is working.  Tr. 50.

Withrow stated that, when she was in Florida, she was able to lie down.  Tr. 50.  When her attorney referenced the fact that Withrow liked to read romance novels and asked if she could remember today what she read yesterday, Withrow stated that she no longer has the patience to read anything and that she hasn't read a book since 2010.  Tr. 50.

## 2. Vocational Expert's Testimony

Vocational Expert Lynn Smith ("VE") testified at the hearing.  Tr. 52-57.  The ALJ discussed with the VE Withrow's past work as a financial specialist.  Tr. 53.  The ALJ asked the VE to determine whether a hypothetical individual of Withrow's age, education and work experience could perform her past work or any other work if that person had the following characteristics: can perform light work, can occasionally climb ramps, stairs, ladders, ropes and scaffolds; can perform detailed but not complex tasks free of fast-paced production quotas; and can have only routine workplace changes.  Tr. 53.  The VE answered that such an individual could not perform Withrow's past work but could perform work as a mail clerk (75,000 national jobs); office helper (50,000 national jobs); and information clerk (680,000 national jobs).  Tr. 53-54.  Second, the ALJ asked the VE if her answer would change if the individual could frequently

stoop, kneel, and crouch; occasionally crawl; could never be exposed to unprotected heights; and can perform simple routine and repetitive tasks. Tr. 54. The VE answered that her answer would not change. Tr. 54. Third, the ALJ asked the VE if her answer would change if the following additional limitations were added: can have superficial contact with others and cannot perform tasks involving arbitration, negotiation, confrontation, directing the work of others, persuading others, or being responsible for the safety and welfare of others. Tr. 54. The VE replied that her answer would not change. Tr. 54.

Fourth, the ALJ asked the VE whether the individual described in the third hypothetical could perform work if that person were limited to sedentary work. Tr. 55. The VE answered that such an individual could perform work as an order clerk (160,000 national jobs); document preparer (2.2 million national jobs); and charge account clerk (140,000 national jobs). Tr. 55. Fifth, the ALJ asked the VE if her answer would change if the individual described above would have to sit for 20 minutes and then stand up for about a minute before sitting down again. Tr. 55. The VE stated that her answer would not change. Tr. 55. Sixth, the ALJ asked the VE to what extent a person can be off-task and still be able to perform the jobs the VE identified, and the VE replied that a person could be off-task no more than 10% of the time. Tr. 55.

Next, Withrow's attorney asked the VE whether the jobs she identified could be performed by a person who would miss a half a day of work per week due to migraines. Tr. 56. The VE stated that she believed such a person could perform the jobs she identified. Tr. 56. The VE explained that anything up to two days a month would be okay. Tr. 56. Withrow's attorney asked whether the individual could perform these jobs if she was unable to maintain attention and focus 11-20% of the workday and the VE stated that such a person could not perform any jobs. Tr. 56.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.      If claimant is doing substantial gainful activity, he is not disabled.

2.      If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[4] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his April 25, 2016, decision, the ALJ made the following findings:

1.  The claimant meets the insured status requirements of the Social Security
    Act through December 31, 2018.  Tr. 12.

2.  The claimant has not engaged in substantial gainful activity since
    September 4, 2013, the alleged onset date.  Tr. 12.

3.  The claimant has the following severe impairments: obesity, degenerative
    disc disease of the lumbar spine, lumbar facet osteoarthropathy,
    lumbosacral radiculopathy, migraine disorder, affective disorder, anxiety
    disorder, bipolar disorder.  Tr. 12.

4.  The claimant does not have an impairment or combination of
    impairments that meets or medically equals the severity of one of the
    listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 13.

5.  The claimant has the residual functional capacity to perform light work as
    defined in 20 CFR 404.1567(b) and 416.967(b) with the following
    additional limitations.  The claimant can occasionally climb ladders,
    ropes, scaffolds, ramps, and stairs.  The claimant can frequently stoop,
    kneel, crouch, and occasionally crawl.  The claimant must avoid
    unprotected heights.  The claimant can perform simple, routine, and
    repetitive tasks.  Her work environment must be free of fast-paced
    production requirements and routine work place changes.  The claimant
    can tolerate superficial contact with others, in that she cannot perform
    tasks involving arbitration, negotiation, confrontation, directing the work

---

[4] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations
to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20
C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to
the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

of others, persuading others, or being responsible for the safety or welfare of others.  Tr. 15.

6.     The claimant has is unable to perform any past relevant work.  Tr. 19.

7.     The claimant was born on February 16, 1973 and was 40 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 20.

8.     The claimant has at least a high school education and is able to communicate in English.  Tr. 20.

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  Tr. 20.

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 20.

11.    The claimant has not been under a disability, as defined in the Social Security Act, from September 4, 2013, through the date of this decision. Tr. 21.

## V. Plaintiff's Arguments

Withrow objects to the ALJ's decision on four grounds: (1) the ALJ failed to give valid reasons for rejecting the opinion of Kristen Drollinger, (2) the ALJ failed to give valid reasons for rejecting the functional capacity assessment provided by Dean Sarris; (3) the ALJ did not properly evaluate Withrow's credibility; and (4) the ALJ did not meet her burden at Step Five. Doc. 12, p. 1.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ did not err when explaining the weight he gave to Drollinger's opinion

Withrow argues that the ALJ did not state a valid reason for rejecting the opinion of her treating source, Kristen Drollinger.  Doc. 12, p. 14.  Withrow cites law regarding treating physician opinion evidence but concedes that Drollinger, a licensed counselor, is not a treating physician.  Doc. 12, p. 15; *Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011) (mental health counselor is an "other" source, not a treating source subject to the treating physician rule); SSR 06-3p, 2006 WL 2329939, at *2 (listing types of acceptable medical sources and "other" sources).  Therefore, the ALJ was not required to follow the treating physician rule when he considered Drollinger's opinion.

The ALJ was required to consider, and did consider, the opinion of Drollinger, an "other" source.  *See* 20 C.F.R. 404.1527(f); SSR 06-3p, 2006 WL 2329939, at *2.  The ALJ explained,

> I give little weight to the opinion of treating counselor from Portage Path Behavioral Health Kristen Drollinger LPCC, who stated that the claimant would miss about three days of work per month and would be off task fifteen to twenty percent of a given workday (28F1-3). I do not give controlling weight to this opinion because it is inconsistent with the claimant's own statements of late that her mental health symptoms are well controlled when she takes her medications as prescribed (e.g., 23F10). Moreover, this opinion is inconsistent with the claimant's routine daily activities, and her shown ability to tolerate the stress of air travel (3E3-5, 23F10).

Tr. 19.  Withrow finds fault with the ALJ's second and third reasons (daily activities and tolerating the stress or air travel) but ignores the ALJ's first reason: Withrow herself repeatedly

stated that her mental health symptoms were well controlled by medication.  The ALJ remarked elsewhere in her decision that Withrow had "stated on multiple occasions to treating providers, in 2014 and 2015, that she feels her bipolar, depressive, and anxiety symptoms are well-controlled."  Tr. 18.  This is an accurate summation of the record evidence, as detailed by the undersigned in the medical evidence section, *supra*, and, alone, is sufficient to support the ALJ's reason for assigning little weight to Drollinger's opinion.  *See* § 404.1527(c) (the ALJ considers the supportability and the consistency with the record as a whole when assigning weight to an opinion); *Shepard v. Comm'r of Soc. Sec*., 705 Fed. App'x 435, 440 (6th Cir. 2017) (the ALJ properly found a treating source opinion not supported by or consistent with the record when the source's notes indicated that the claimant's symptoms were controlled by medication).

Withrow argues that the ALJ's reliance upon her daily activities is unavailing because, in her function report cited by the ALJ (Tr. 262-264), Withrow had stated that she had to sit to prepare food, did not do chores in the yard or the house, had difficulty going outside due to migraines, could only shop for 15 minutes, and had difficulty managing money.  Doc. 12, p. 16. It is true that Withrow stated that she did (or did not do) these things; but it is also true that Withrow stated that she made meals daily, spent time with her family, attended appointments, could pay bills and manage her finances, performed activities of self-care without assistance, drove a car, and shopped in person and also by phone and computer.  Tr. 262-264.  Notably, Withrow's reasons for not performing certain activities in her function report (chores, going outside, sitting down to cook, and shopping for no more than 15 minutes and using a shopping cart) relate to her physical impairments, not her mental impairments.  The ALJ's reliance upon these statements in Withrow's function report is not erroneous.

Finally, Withrow asserts that the ALJ improperly relied on the fact that she could handle the stress of air travel as a reason to discredit Drollinger's opinion. She claims, "In today's society, this was akin to stating that someone was able to tolerate the stress of driving in a car." Doc. 12, p. 16. The undersigned disagrees; air travel is different, and more stressful, than driving a car, and the ALJ properly relied on the fact that Withrow was able to handle the stress of air travel when considering Drollinger's opinion.

In her reply brief, Withrow challenges Defendant's argument, evidence, and narrative presented in her brief. Doc. 14, p. 3. She cites to records in the transcript that she did not cite in her opening brief (e.g., Tr. 816, 952) and cites certain records that she did cite to in her opening brief, but for other reasons (e.g., Tr. 918, 954). In other words, she appears to be attempting to create and expand on arguments not made in her opening brief. Regardless, Withrow's attempt to find fault with Defendant's brief is not the issue before the Court; the issue is whether the ALJ's decision is supported by substantial evidence. As explained above, it is. It must, therefore, be affirmed. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion).

**B. The ALJ did not err when explaining the weight he gave to Sarris' opinion**

Again, Withrow concedes that Sarris is not a treating physician (Doc. 12, p. 17); therefore, despite her instance to the contrary, the treating physician rule does not apply to Sarris' opinion. *See, e.g., Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (treating source opinions are entitled to controlling weight and the ALJ must give "good reasons" for discounting their opinions); § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's medical

opinion); *c.f.* § 404.1527(f)(2) ("The adjudicator generally should explain the weight given to opinions from [unacceptable medical] sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning").

Withrow's assertion that the ALJ "ignored" Sarris' opinion is wrong; the ALJ considered Sarris' opinion.  He explained,

> I give little weight to the opinion of physical therapist Dean Sarris who stated the claimant could stand and or walk, and sit for less than three hours during an eight-hour workday, can never climb, crouch, or crawl, can occasionally balance, stoop, and kneel, will miss more than four days of work per month, would be off task more than twenty percent of any given workday, and would need to lie down for more than two hours during a typical workday (12F1-1)....This opinion is not well supported by the evidence because the stated restrictions on sitting, standing, and walking are inconsistent with the claimant's recent travels, and are not reasonably expected to be caused by the only mild to moderate degenerative changes at L4-5 and L5-S1, per MRI findings dated June 25, 2013 (1F15).  Moreover, the total preclusion on climbing, crouching and crawling is inconsistent with observed signs of the claimant having intact range of motion in her trunk and in her extremities (e.g., 7F70).  Finally, Mr. Sarris does not adequately address the fact that the claimant "did not demonstrate maximal effort with grip testing" during the functio[nal] capacity evaluation he administered (12F6).  For these reasons, I give little weight to his assessment.

Tr. 18.

Withrow challenges the ALJ's statement that her MRI showed more than mild to moderate degenerative changes.  Doc. 12, p. 18.  This argument fails.  See Tr. 319 (MRI showing moderate to mild findings and the following impression: "mild degenerative changes in lower lumbar spine").  Next, Withrow argues that the treatment note cited by the ALJ also shows some allodynia (increased sensitivity) in the lateral aspect of her right thigh and a positive straight leg raise test.  Doc. 12, p. 19 (citing Tr. 465).  This does not undermine the ALJ's statement that Withrow had been observed having intact range of motion in her trunk and extremities.  Treatment notes that Withrow cites as showing that she "demonstrated problems...[with]

extremity weakness, gait disturbance, and numbness in her extremities" are belied by the records she cites.  Doc. 12, p. 19 (citing 434, 457, 460).  In all these records Withrow complains of weakness, numbness and/or difficulty walking, but she was observed by the providers, upon objective examination, to have no weakness, numbness or gait disturbance.  See Tr. 434, 457-458, 460-461.  Lastly, Withrow misses the point of the ALJ's "focus" on the grip testing performed by Sarris; it was significant because Sarris observed that Withrow did not demonstrate maximum effort, i.e., her test results were not considered a consistent measure of the test, as Sarris himself observed (Tr. 676).

### C. The ALJ's credibility determination was proper and is supported by substantial evidence

To evaluate the credibility of a claimant's symptoms, an ALJ considers the claimant's complaints along with factors such as the objective medical evidence, treating or nontreating source statements, treatment received, and other evidence.  20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304.[5]  The ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  *Id.* at 4.

Withrow argues that the ALJ "disregarded the fact that Withrow had an occipital nerve block for her migraine headaches on November 17, 2015" and lumbar injections.  Doc. 12, p. 20; see also Doc. 14, p. 2.  Although the ALJ did not cite to Withrow's occipital nerve block, it does not follow that he did not consider it.  An ALJ is not required to discuss every piece of evidence in his written decision.  *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 507-508 (6th Cir. 2006).  The ALJ explained that Withrow's doctor treated her for migraines and changed her

---

[5] SSR 16-3p replaces SSR 96-7p and is applies to rulings on or after March 28, 2016.  *See* 2017 WL 5180304, at *13.

medications in 2013 and that her symptoms had improved since that time.  Tr. 16.  He

recognized that Withrow could not afford her medications at one time and her symptoms

worsened, but she was able to secure funds to pay for her treatment again, which she resumed

and which improved her condition.  Tr. 16.  He referenced Withrow's lumbar injections and

commented that she had a positive response to these injections, both in the amount of relief she

experienced and the length of time her relief lasted.  Tr. 17.  These were accurate statements and

appropriate when considering credibility.  *See* SSR 16-3p, at *6-7 (an ALJ considers the

longitudinal history and the medical sources' reports about the claimant's responses to

treatment).  Withrow asserts that her injections were "the equivalent of surgical procedures."

Doc. 12, p. 20.  They may be equivalent to surgical procedures, but injections are not "surgery"

and are common treatments for pain.[6]

      Moreover, the ALJ's credibility assessment was also based on the objective evidence.  Tr.

16-17 (commenting that Withrow had a normal brain MRI, a lumbar MRI that showed mild to

moderate degenerative changes, and had primarily normal physical exam findings including

normal gait and station and full strength in her lower back and legs).  *See* SSR 16-3p, at *5 (the

ALJ considers objective evidence such as physical exam findings and providing, by way of

explanation, that a claimant who alleges reduced muscle strength and an inability to stand and

walk more than a few minutes a day should have correlating signs of muscle wasting).  The ALJ

observed that Withrow's testimony was inconsistent; she detailed side effects of her medication,

including fatigue and loss of concentration and indicated that she could not concentrate long

enough to read a book, but the record does not support her complaints of medication side effects.

---

[6] *See, e.g.,* Mayo Clinic, "Back Pain: Medication" available at https://www.mayoclinic.org/diseases-
conditions/back-pain/basics/treatment/con-20020797 (last visited May 2, 2018) (listing injections as treatment for
pain) and "Cluster Headache: Preventative Treatment" available at https://www.mayoclinic.org/diseases-
conditions/cluster-headache/diagnosis-treatment/drc-20352084 (last visited May 2, 2018) (listing occipital nerve
block as preventive treatment for chronic headaches).

Strikingly, she had also testified that she presently enjoyed reading novels, as the ALJ observed. Tr. 17-18.  SSR 16-3p, at \*8 (the ALJ considers whether the claimant's statements are consistent and supported by record evidence).  The ALJ's consideration of evidence in the record that Withrow sat in a car on a drive down and back from Georgia and sat on a plane down and back from Florida as inconsistent with her assertion that she could not sit for more than 20 minutes at a time (Tr. 16) was also permissible.  *Id.*

In her reply brief, Withrow challenges the evidence in the record relied upon by Defendant in her brief.  Doc. 14.  With respect to her migraines, she states that Dr. Casanova found that her headaches had improved with treatment but were not eliminated.  Doc. 14, p. 2. The ALJ found Withrow's migraines to be a severe impairment and accounted for them in his RFC.  Tr. 16.  That the ALJ did not find that Withrow's migraines were disabling was not error.

In sum, Withrow disagrees with the ALJ's credibility determination, but it is supported by substantial evidence and must, therefore, be affirmed.  *See Garner*, 745 F.2d at 387 (A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."); *Jones*, 336 F.3d at 477 (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion).

### D. The ALJ's finding at Step Five was not erroneous

Withrow argues that the ALJ did not meet his burden at Step Five.  Doc. 12, p. 21.  She complains that the VE testified that a person off-task more than 10% of the time or absent more than two days a month could not perform work and argues that there was substantial evidence to support a finding that Withrow would have these work limitations.  Doc. 12, p. 21.  She asserts, without more, that the ALJ "did not properly evaluate the cumulative effects of Withrow's impairments, especially the effect that her radiculopathy, migraines and psychiatric impairments

had on her ability to maintain attention and concentration and not miss an excessive amount of work."  Doc. 12, p. 22.  As described above, the ALJ did not credit the opinions of Drollinger and Sarris that Withrow would be off-task and absent to the extent opined and his decision was not erroneous.

## VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated: May 3, 2018

Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).